NOT FOR PUBLICATION                                    (Doc. Nos. 10, 17)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____
                                        :
CECILIA J. FOGARTY,                     :
                                        :
                        Plaintiff,      :       Civil No. 14-4525 (RBK/JS)
                                        :
            v.                          :       **OPINION**
                                        :
HOUSEHOLD FINANCE                       :
CORPORATION III et al,                  :
                                        :
                        Defendants.     :
_____    :

**KUGLER**, United States District Judge:

This matter comes before the Court on the Motions to Dismiss of Defendants Household

Finance Corporation III ("Household") (Doc. No. 10), and LSF8 Master Participation Trust

("LSF8") and Caliber Home Loans, Inc. ("Caliber") (Doc. No. 17) (collectively "Defendants")

Plaintiff Cecilia J. Fogarty's ("Plaintiff" or "Fogarty") Amended Complaint pursuant to Rule

12(b)(6), in which Plaintiff asserts numerous federal and state law claims against these

Defendants.  For the reasons stated herein, Defendants' Motions to Dismiss will be granted.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

Household is a foreign, for-profit corporation registered to do business in New Jersey,

and is in the business of making, holding, and servicing residential mortgage loans.  (Amended

Complaint ("Compl.") ¶¶ 12, 81.)  LSF8 is an investor in home mortgages and Caliber a servicer

---

[1] On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the Plaintiff."  Accordingly, the following facts are taken from Plaintiff's Amended Complaint.  See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).

of residential mortgage loans.  (<u>Id.</u> ¶¶ 15-16.)  Both LSF8 and Caliber have a business address in Oklahoma City, Oklahoma.  (<u>Id.</u>)  Additionally, John P. Fogarty ("John") and Dora J. Cullen ("Cullen") are Defendants in the present litigation, but are not parties to these motions.  John is Plaintiff's husband, and resides in Sarasota, Florida.  (<u>Id.</u> ¶ 13.)  Cullen resides in Levittown, Pennsylvania.  (<u>Id.</u> ¶ 14.)

Fogarty is the record owner of a property located at 12 Lancaster Court, Westampton, New Jersey (the "Property"), by virtue of a quitclaim deed from John, dated May 25, 2011, and recorded June 1, 2011, in the Burlington County Clerk's Office.  (<u>Id.</u> ¶ 17.)  Fogarty and John originally took title to the Property in 1979, and purchased the Property using the proceeds of a First Purchase Money Mortgage ("FPMM") with New Jersey National Bank.  (<u>Id.</u> ¶¶ 20, 22.)  This FPMM was paid in full, and a Cancellation of Mortgage was recorded on October 15, 2001 in the Burlington County Clerk's Office.  (<u>Id.</u> ¶ 24.)

In 2001 and 2002 two new mortgages were recorded on the Property (the "2001 Mortgage" and the "2002 Mortgage"), though these mortgages were discharged in 2002 and 2003, respectively.  (<u>See</u> <u>id.</u> ¶ 25.)  The 2001 Mortgage was for $91,806.87, and on May 5, 2002 MBNA Consumer Services assigned this mortgage to Household prior to its discharge.  (<u>Id.</u> ¶ 25(A)-(B).)  The 2002 Mortgage was for $179,994.71, and was originally recorded by Household.  (<u>Id.</u> ¶ 25(E).)  On September 22, 2003, a mortgage on the Property to Household, in the amount of $233,093.51 ("2003 Mortgage"), was created, and later recorded in the Mortgage Book at the Burlington County Clerk's Office.  (<u>Id.</u> ¶¶ 25(G), 26.)  Household was the holder and servicer of the 2003 Mortgage from the date of its origination until 2014.  (<u>See</u> <u>id.</u> ¶¶ 81-85.) Fogarty never received any documents related to the 2001, 2002, or 2003 Mortgages at the time

of their origination, including any Truth in Lending Statements ("TILA statement") or any "Notices of Right to Cancel."  (Id. ¶ 92.)

According to Fogarty, these mortgages, including the 2003 Mortgage, were obtained through fraud.  (Id. ¶ 93.)[2]  When the 2003 Mortgage was obtained, Fogarty did not take part in the matter or have any knowledge of it.  (Id. ¶ 80.)  In September 2003, John applied for the 2003 Mortgage on the Property, and Cullen participated in the transaction, pretending to be Fogarty.  (Id. ¶¶ 61, 93, 96.)  John apparently hid the 2003 Mortgage from Fogarty, and it was not until about August 2008 that Fogarty discovered that John had mortgaged the Property in 2003.  (Id. ¶¶ 43-45.)  At that time, Fogarty was also just beginning to discover the vast extent of her husband's misappropriation of her assets, including depleting Fogarty's IRA, stealing money from Fogarty's small business account, stealing funds from Fogarty's other investment accounts, and mortgaging the Property on the three noted occasions.  (See id. ¶¶ 38-43, 64-74.)  Soon after discovering the fraud, Fogarty approached John and asked him about his knowledge of the 2003 Mortgage, and showed him the face page to the mortgage, which she had obtained from Household.  (Id. ¶ 60; see also id. ¶ 48.)  John told Fogarty that he had obtained the 2003 Mortgage with the help of Cullen, who had signed Fogarty's name on the mortgage documents.  (Id. ¶ 61.)

Between 2005 and 2012, John also negotiated and obtained payment deferrals on the 2003 Mortgage with Household, without Fogarty's knowledge.  (Id. ¶ 52.)  According to Household's records, John obtained at least six deferrals on the 2003 Mortgage during these years.  (Id. ¶ 53.)  On February 6, 2007, Household advanced $10,082.90 to Westampton

---

[2] The 2001 and 2002 Mortgages were discharged prior to the date on which Fogarty allegedly learned of those mortgages, and they are not the subject of the present litigation.  Accordingly, the Court will hereinafter refer only to the 2003 Mortgage, unless otherwise noted.

Township for delinquent property taxes from 2005 and 2006.  (Id. ¶ 55.)  Household also issued

letters on May 13, 2008, April 28, 2009, and March 16, 2010, addressed to John and Fogarty,

noting that the payment on the 2003 Mortgage was increased as a result of Household having to

acquire and pay for Hazard Insurance on the Property.  (Id. ¶ 56.)  Fogarty had no knowledge of

John's deferral requests, the tax payments, or the insurance payments at the time.  (Id. ¶ 57.)

Once Fogarty learned of the 2003 Mortgage, she contacted Household on or about

August 28, 2008, informing William Powell at Household of a possible fraudulent mortgage.

(Id. ¶ 44.)  She was directed to speak with Steve Mertz, a Household representative, then spoke

further with another different representative from Household's fraud department, and was later

referred to Household's foreclosure department.  (Id. ¶¶ 44-45.)  Fogarty visited one of

Household's branch offices on September 2, 2008, to inform Household about the alleged fraud

and request a copy of the 2003 Mortgage.  (Id. ¶¶ 45-46.)  After speaking with Household

employee Jennifer Kerrick, Fogarty eventually produced her driver's license to be photocopied,

and was told it would take a few days to locate the paperwork.  (Id. ¶¶ 46-47.)  In a matter of

days, Fogarty received a one page document from Household, the face page of the 2003

Mortgage, without any other paperwork.  (Id. ¶ 48.)  Fearing she would lose her home due to

foreclosure, Fogarty spoke with Mertz and Powell again that September, who advised her to

contact Household's Hardship Department.  (Id. ¶ 50.)  After contacting the Hardship

Department, Fogarty believed Household would continue an investigation of the fraud she had

reported.  (Id. ¶ 51.)

Fogarty did not request that Household investigate the fraud again until October 10,

2011, over three years later.  (See id. ¶ 102, 106.)  The very day Household received her

correspondence, in a letter from Ms. McPherson of Household's Customer Resolution

Department (the "October 10 Letter"), Household replied to Fogarty's request, saying, "[Household's] branches are closed and we are unable to investigate any conversations that may have transpired.  Our records do not reflect that a fraud claim was submitted." (Ex. E to Compl., October 10 Letter.)  The letter gave further instructions for Fogarty to complete a fraud claim and gave her a phone number, which apparently did not work, to reach Household's Fraud and Investigations Department.  (Id.)  The October 10 Letter also spelled out the terms of the 2003 Mortgage and the history of insurance placed on the account by Household.  (Compl. ¶ 103.) Fogarty notes that the letter did not include language stating that Household was a debt collector and that information obtained could be used for debtor collection purposes, despite the October 10 Letter indicating that there was a past due amount of $23,286.02 on the 2003 Mortgage.  (Id. ¶¶ 104-05.)

After receiving the October 10 Letter, Fogarty called and spoke with Ms. McPherson to explain the fraudulent nature of the mortgage.  (Id. ¶ 108.)  Fogarty also spoke with a Household representative named "Garo" who allegedly "advised Fogarty to resolve the issue without an attorney and directed Fogarty to the Customer Resolution Department," and then a Household representative named Johna Thomas at the Customer Resolution Department who instructed Fogarty to complete a claim form that she would be receiving in one to two weeks.  (Id. ¶¶ 108-09.)  Once she received the claim form, Fogarty submitted a "Beneficial Claim Form" and "Affidavit of Forgery" to the Fraud Claims & Resolutions Department on November 9, 2011. (Id. ¶ 110.)  These forms explained the nature of the fraud and provided signature samples and a copy of Fogarty's photo identification.  (Id.)  On November 11, 2011, Household's Customer Resolution Department sent Fogarty a letter stating that "[d]ue to the closure of all [Household]

5

and Beneficial branches in 2009, we are unable to investigate any conversations that may have taken place in 2008 regarding a claim of a fraudulent loan." (Id. ¶ 111.)

Fogarty called Ms. Thomas at Household's Customer Resolution Department on December 12, 2011, and left a message asking how long the investigation would take. (Id. ¶ 117.) That same December, Household's Fraud Department apparently reviewed the 2003 Mortgage account and Fogarty's allegations, denied Fogarty's claim, and determined that she was liable for the debt without further explanation. (Id. ¶ 118.) Later, in February 2012, Fogarty received another communication from Household stating that her fraud claim was denied. (Id. ¶ 120.)

Between 2011 and 2014, Fogarty also made several attempts through the New Jersey Department of Banking and Insurance ("NJDBI"), the Consumer Financial Protection Bureau ("CFPB"), the Westampton Police Department, and Household to have the 2003 Mortgage removed as a lien on her property. (Id. ¶ 101.) Having no success in obtaining relief from Household, Fogarty wrote to the NJDBI in January 2012. (Id. ¶ 119.) At the end of November 2011, Household had also sent a letter to Joseph Mellito, an investigator at the NJDBI, enclosing thirteen documents from the 2003 Mortgage transaction. (Id. ¶ 112.) However, none of these documents included a photo identification of Fogarty. (Id.) In the Fall of 2013 the NJDBI responded to Fogarty's request for an investigation by stating that Household did not fall under its jurisdiction, as Household was not licensed under the NJDBI, and directed Fogarty to the CFPB. (Id. ¶ 128.)

Just after writing to the CFPB, Fogarty received a copy of documents previously sent by Household to the CFPB, dated October 28, 2013, which fully revealed to Fogarty the existence of the prior mortgages and the 2003 Mortgage. (Id. ¶ 129.) Household's letter to the CFPB, sent

6

in response to the CFPB's own inquiries to Household, reiterated that Household's Fraud Department reviewed Fogarty's account on two separate occasions and determined that she was liable for the debt.  (Id. ¶ 130.)  Fogarty wrote a second letter to the CFPB on November 2, 2013, asserting that she did not take part in the mortgage transactions that she had "just learned about fully from documents [Household] sent to the [CFPB]."  (Id. ¶ 132.)

During 2012 Fogarty also engaged the services of a forensic consultant, William Ries, to conduct two handwriting analyses, with the purpose of determining in part whether the several loan documents related to the Household mortgages were not in fact signed by Fogarty.  (Id. ¶¶ 121-22.)  Using known signatures from Fogarty, John, and Cullen, Ries compared these signatures to the "questioned documents" and determined, with a reasonable degree of scientific certainty, that the questioned signatures supposed to be Fogarty's on the mortgage documents were not in fact from Fogarty.  (Id. ¶¶ 122-24.)  She sent the handwriting analyses to Household, along with an explanation of the fraud, and again asked that she be removed from the 2003 Mortgage.  (Id. ¶ 126.)

Fogarty's counsel sent Household a Qualified Written Request ("QWR") on February 7, 2014, which Household allegedly failed to timely respond to.  (Id. ¶ 134.)  Household also failed to respond to counsel's requests for "a complete explanation of and the documents that formed the bases for [Household]'s unilateral decision that Fogarty is still liable for payment of the 2003 Mortgage."  (Id. ¶ 135.)  The documents Household sent Fogarty relating to the 2003 Mortgage did not include any documents "related to the verification of the identity of the person who purported to sign the documents," despite counsel's specific request for copies of photo identification or other identification collected at the closings for all the mortgages.  (Id. ¶ 136.)  According to Fogarty, Household also failed to provide her counsel with "a copy of the

Promissory Notes that the mortgages secured and affidavits that the original Notes are in

[Household]'s possession[,] … copies of front and back of all cleared checks disbursed at the

funding of the mortgage transactions[,] … a copy of the 1003 [sic] documents (loan applications)

for the mortgage transactions[,] … account information for each creditor paid off as part of the

mortgage transactions including copies of the credit reports run as part of the mortgage

application, the name and address on the credit card account[,] … [and] all the information

[counsel] ha[d] requested in order to properly investigate and determine the extent of the fraud

perpetrated," despite counsel's request.  (Id. ¶¶ 142-46.)

Household did provide Fogarty with a copy of the Customer Identification Verification

("CIV") from the 2003 Mortgage transaction.  (Id. ¶ 153.)  This document showed that, for

verification of Cecilia J. Fogarty's identity, a state-issued New Jersey driver's license, with a

driver's license number matching that of Fogarty's, and an expiration date of August 31, 2007,

was presented at the closing to verify the identity of the person, Cullen, who signed the 2003

Mortgage documents.  (Id.)  The CIV also indicated that a Vehicle Registration Card and a Visa

credit card bearing Fogarty's name were presented to confirm the signatory's identification.  (Id.

¶¶ 161, 163.)  It was later determined that the Visa credit card was obtained fraudulently.  (Id. ¶

167.)

Household also revealed, in a letter dated April 4, 2014, that it had been mailing all

correspondence related to the mortgage transactions to John and Fogarty at P.O. Box 50382,

Sarasota, Florida 34232.  (Id. ¶¶ 147-48.)  Apparently Household was not mailing these

correspondences to the Property address because John had previously called Household's

Collection Department and requested that all correspondence be sent to the Florida address, and

Household claimed they were required to abide by John's request because he was a party on the account.  (<u>Id.</u> ¶ 148.)

On February 21, 2007, Household filed a Lis Pendens related to a foreclosure action commenced by Household against John and Fogarty on February 8, 2007, which in turn related to the 2003 Mortgage.  (<u>Id.</u> ¶ 25(I).)  Although the foreclosure action was dismissed on March 2, 2007, the Lis Pendens action was never cancelled of record.  (<u>Id.</u>)  On September 18, 2008, Household filed another Lis Pendens related to a foreclosure action commenced by Household against John and Fogarty on July 10, 2008, also relating to the 2003 Mortgage.  (<u>Id.</u> ¶ 25(J).)  This Lis Pendens action was cancelled and discharged by virtue of a Discharge of Lis Pendens recorded on January 8, 2009.  (<u>Id.</u>)  As of January 14, 2014, Fogarty's credit score dropped from 869 to 716 due to the reporting by Household of non-payment on the 2003 Mortgage.  (<u>Id.</u> ¶ 171.)  A June 6, 2014, Mortgage Statement from Caliber, addressed to Fogarty and John, stated that the past due amount is $13,006.64 for the 2003 Mortgage.  (<u>Id.</u> ¶ 172.)  Fogarty's most recent credit report, from July 2014, shows derogatory reporting related to the 2003 Mortgage in October, November, and December 2013, and the 2003 Mortgage account is shown as open and at least sixty days past due.  (<u>Id.</u> ¶¶ 173-74.)  Despite her requests and notifications of the fraud, Fogarty claims Household has failed to acknowledge the fraud and has continued to threaten Fogarty with foreclosure of the 2003 Mortgage for nonpayment.  (<u>Id.</u> ¶ 181.)

On June 6, 2014, Plaintiff received a letter from Caliber informing her that Household had sold the 2003 Mortgage to LSF8 on May 3, 2014.  (<u>Id.</u> ¶ 27; Ex. B to Compl., Notice of Sale ("Notice of Sale").)  The assignment of the 2003 Mortgage to LSF8 was dated August 8, 2014, and was recorded on August 20, 2014, with the Clerk of Burlington County.  (Ex. B to Sperling Cert., August 8, 2014, Assignment of 2003 Mortgage from Household to LSF8 ("Assignment of

Mortgage").)[3]  Fogarty received another letter dated June 10, 2014, informing her that Caliber

would be servicing the 2003 Mortgage henceforth.  (See Ex. C to Sperling Cert., Notice of

Transfer of Servicing Letter ("Notice of Servicing Transfer").)

 Plaintiff filed a Complaint in the Superior Court of New Jersey, Burlington County,

Chancery Division, against Household, John, and Cullen on May 30, 2014.  (See Notice of

Removal (Doc. No. 1).)  Household removed the action to this Court on July 17, 2014, pursuant

to 28 U.S.C. § 1441 and § 1446, and the Court has jurisdiction over this case pursuant to § 1331

and § 1367.  (Id.)  Plaintiff then filed an Amended Complaint on August 7, 2014, naming LSF8

and Caliber as additional defendants (Doc. No. 5).

 In Plaintiff's Amended Complaint, she alleges: (1) that she is entitled to rescission of the

2003 Mortgage and the removal of the 2003 Mortgage as a lien against the Property from

Household, LSF, and Caliber under the Truth in Lending Act (Count I); (2) Household and

Caliber tortiously interfered with her economic advantage by the purported damaging of

Plaintiff's credit history (Count II); (3) Household, Caliber, and LSF8 failed to give proper

notice of the transfer of ownership or servicing of the 2003 Mortgage as set forth under the Real

Estate Settlement Procedures Act ("RESPA") (Count III); (4) Household committed fraud

(Count VI); (5) Household committed slander of title (Count VII); (6) Household violated

RESPA by failing to properly investigate and report its findings regarding Plaintiff's allegations

of fraud (Count VIII); (7) Household and Caliber violated the New Jersey Consumer Fraud Act

---

[3] A court may "consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1191, 1196 (3d Cir. 1993); see also In re Burlington Coat Factory, 114 F.3d 1410, 1426 (3d Cir. 1997) (noting the inquiry is whether the claims in the complaint are "based" on the extrinsic document).  Neither party disputes the authenticity of the documents included with Defendants LSF8's and Caliber's Brief and Reply Brief, attached to the Certification of Joy Sperling and the Supplemental Certification of Joy Sperling.  Because at least a portion of Plaintiff's claims relate directly to the information in these documents, the Court will consider them for deciding the present motion.

("NJCFA") and the Fair Debt Collection Practices Act ("FDCPA") (Count IX); (8) that she is
entitled to quiet title on her Property, against Household and LSF8 (Count X); (9) Caliber should
be compelled to cancel and discharge the 2003 Mortgage on behalf of LSF8 (Count XII); (10)
Household committed identity theft (Count XIV); (11) Household and Caliber made
unauthorized payments of property taxes on the Property (Count XV); (12) Household recklessly
or intentionally inflicted emotional distress on Plaintiff (Count XVI); and (13) Household
committed per se negligence for failing to abide by federal laws (Count XVII).

On August 28, 2014, Household moved to dismiss certain Counts in Plaintiff's Amended
Complaint (Doc. No. 10), and on September 12, 2014, LSF8 and Caliber also moved to dismiss
all relevant Counts in the Amended Complaint (Doc. No. 17).  Household specifically moved to
dismiss Counts One, Two, Four, Five, Six, Seven, Nine, Eleven, Twelve, Thirteen, Fourteen,
Fifteen, Sixteen, and Seventeen, (Def. Household's Br. at 1), while LSF8 and Caliber moved to
dismiss Counts One, Two, Three, Nine, Ten, Twelve, and Fifteen.  (Defs. LSF8's and Caliber's
Br. at 1.)[4]  Because the parties have fully briefed the issues in the present motions, the Court will
proceed to their arguments.

## II.    LEGAL STANDARD

Rule 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which
relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When evaluating a motion to dismiss, "courts
accept all factual allegations as true, construe the complaint in the light most favorable to the
plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff
may be entitled to relief."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)
(quoting Phillips, 515 F.3d at 233).  In other words, a complaint is sufficient if it contains enough

---

[4] Household did not move to dismiss Plaintiff's RESPA claims in Counts Three and Eight, or Plaintiff's quiet title
claim in Count Ten.  (See Def. Household's Rep. Br. at 1 n.1.)

factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). It is not for courts to decide at this point whether the moving party will succeed on the merits, but "whether they should be afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002). Yet, while "detailed factual allegations" are not necessary, a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555; see also Iqbal, 556 U.S. at 678-79.

To make this determination, a court conducts a three-part analysis. Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Id. (quoting Iqbal, 556 U.S. at 675). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Santiago, 629 F.3d at 131 (quoting Iqbal, 556 U.S. at 680). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Santiago, 629 F.3d at 131 (quoting Iqbal, 556 U.S. at 680). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. Id.

## III.   DISCUSSION

### a.  TILA Claim for Rescission (Count I)

In Count One Plaintiff seeks to rescind the 2003 Mortgage loan and seeks to declare the mortgage and note null and void, pursuant to TILA, see 15 U.S.C. §§ 1601 et seq., and the accompanying Regulation Z.[5]  (Compl. ¶¶ 200-02.)

The right to rescission under § 1635(a) is absolute for three days after the closing of a qualifying loan or the delivery of the information and rescission forms required under the same section.  § 1635(a); see also Sherzer v. Homestar Mortg. Servs., 707 F.3d 255, 256 (3d Cir. 2013).  However, the right of rescission is not perpetual, even if a consumer never receives the requisite disclosures.  Id.  The right to rescind "expire[s] three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first."  § 1635(f); Sherzer, 707 F.3d at 256.  This three year period is not a statute of limitations, but a statute of repose, acting to bar any claims arising after three years, and is not subject to equitable tolling or the discovery rule.  See Beach v. Ocwen Fed. Bank, 523 U.S. 410, 419 (1998); Williams v. Wells Fargo Home Mortg., Inc., 410 Fed. App'x 495, 499 (3d Cir. 2011) (holding that equitable tolling "cannot resurrect the [Plaintiff's] right to rescind the credit transaction" because "the right ceases to exist once a statute of repose has run").

In order to rescind the 2003 Mortgage agreement, Plaintiff would need only send a valid notice of rescission within the prescribed three-year period.  Id. at 258.  She would be required to "notify the creditor of the rescission by mail, telegram or other means of written communication" in order to invoke her right to rescind.  § 226.15(a)(2).

Here, Plaintiff's claim in Count One fails against all Defendants, as it is undisputed that she made no attempt to rescind the 2003 Mortgage until the filing of this lawsuit.  Plaintiff concedes that the 2003 Mortgage was "consummated," see § 1635, on September 22, 2003.

---

[5] See 26 C.F.R. §§ 226.1 et seq.

(Compl. ¶ 25G.)  Therefore, the three year statute of repose took effect on September 22, 2006, nearly eight years before this lawsuit was filed.[6]  Because equitable tolling and the discovery rule do not apply, the Court finds that Count One fails to state a claim upon which relief may be granted.  Accordingly, Count One will be dismissed with prejudice as to all Defendants.

### b.  Tortious Interference Claim (Count II)

In Count Two Plaintiff alleges a claim for tortious interference with her prospective economic advantage, averring that her credit rating was damaged or destroyed due to Household's and Caliber's alleged failure to request that the 2003 Mortgage be deleted as part of her credit history, to remove her name from the 2003 Mortgage, and to remove the 2003 Mortgage as a lien against the property.  (Compl. ¶¶ 223-24.)  As a result of Household's and Caliber's alleged actions, Fogarty claims she was unable to obtain credit.  (Id. ¶ 225.)  The Court finds that Plaintiff's claim in the Count Two is preempted by the Fair Credit Reporting Act ("FCRA").

The allegations in Count Two relate to allegedly inaccurate, adverse credit reporting activity.  Consumer credit reporting is governed by the FCRA, see 15 U.S.C. §§ 1681 et seq., and § 1681t expressly preempts state law claim based on credit reporting activities.  See § 1681(t)(b)(1)(F) ("No requirement or prohibition may be imposed under the laws of any state – with respect to any subject matter regulated under – … Section 1681s-2 of this title, relating to

---

[6] Plaintiff's argument that the payment deferrals granted to John by Household, and Household's and Caliber's advancement as taxes extended the rescission period by acting as refinancing and requiring Defendant to provide new TILA disclosures, is unavailing.  (See Pl.'s Opp'n to Household's Br. ("Opp'n to Household") at 16-17, 36-38.)  Regulation Z clearly provides that "[a] change in the payment schedule … as a result of the consumer's default or delinquency … shall not be treated as a refinancing."  12 C.F.R. § 1026.20(a).  The Official Staff Interpretation to the section confirms this, stating that "[c]hanges in the terms of an existing obligation, such as the deferral of individual installments, will not constitute refinancing unless accompanied by a cancellation of the debt and the substitution of a new obligation."  12 C.F.R. Pt. 1026, Supp. 1, Part 2.  Nor would the payment of delinquent property taxes qualify as refinancing, as it does not constitute a situation where "an existing obligation … is satisfied and replaced by a new obligation undertaken by the same consumer."  § 1026(a); see also 12 C.F.R. Pt. 1026, Supp. 1, Part 2 (stating that "[i]n any form, the new obligation must completely replace the old one.")

the responsibilities of persons who furnish information to consumer reporting agencies"); <u>see also</u> <u>Grossman v. Barclays Bank De.</u>, No. 12-6238, 2014 WL 647970, at *11 (D.N.J. Feb. 19, 2014) (noting that § 1681t "was created 'to eliminate state causes of action relating to the responsibilities of persons who furnish information to consumer reporting agencies.'") (quoting <u>Campbell v. Chase Manhattan Bank, USA, N.A.</u>, No. 02-3489, 2005 WL 1514221, at *16 (D.N.J. June 27, 2005)).  Even Plaintiff appears to tacitly concede that only the FCRA could provide a basis for recovery of credit reporting damages, as her Opposition to Household's Brief refers to the FCRA as the basis for her claim.

For this reason, the Court finds that Plaintiff's state law tortious interference claim is preempted by the FCRA and fails as a matter of law.[7]  Accordingly, Count Two will be dismissed with prejudice against all parties.

### c.  RESPA Claim (Count III)

Plaintiff alleges that LSF8 and Caliber violated Section 6 of RESPA, 12 U.S.C. § 2605, by "failing to give notice of the transfer of service or ownership of the 2003 Mortgage."  (Compl. ¶¶ 244-49.)  LSF8 and Caliber set forth several substantive arguments concerning why Plaintiff's claim fails as a matter of law as to each defendant.  (<u>See</u> Defs. LSF8's and Caliber's Br. ("LSF8 and Caliber Br.") at 10-11.)  In Plaintiff's Opposition to LSF8 and Caliber, she failed to address LSF8's and Caliber's arguments entirely.  (<u>See generally</u> Pl.'s Opp'n to LSF8's and Caliber's Br. ("Opp'n to LSF8 and Caliber"); <u>see also</u> Opp'n to Household.)  Accordingly, the Court finds that Plaintiff has waived this claim against LSF8 and Caliber.  <u>See</u> <u>Ferrante v. Amgen, Inc.</u>, No. 13-

---

[7] While the Court notes that nowhere is it apparent in Plaintiff's Amended Complaint that she is attempting to assert a claim pursuant to the FCRA in Count Two, (<u>see</u> Compl. ¶¶ 22-242), even if Plaintiff did attempt to allege such a claim under the FCRA, it would be dismissed.  <u>See</u> <u>infra</u> at Part III.f (discussing and dismissing possible FCRA claim for allegedly knowingly submitting false information to credit reporting agencies, and failing to report to those agencies that Plaintiff had disputed a debt).

7344, 2014 WL 1092555, at *7 (D.N.J. Mar. 18, 2014) (noting that "Courts in this District have held that the failure to respond to an argument advanced in support of a motion to dismiss results in a waiver of the claim sought to be dismissed.") (citing Griglak v. CTX Mrtg. Co., No. 09–5247, 2010 WL 1424023, at *3 (D.N.J. Apr. 8, 2010)); Leisure Pass N. Am., LLC v. Leisure Pass Group, Ltd., No. 12–3375, 2013 WL 4517841, at *4 (D.N.J. Aug. 26, 2013) ("Plaintiff has waived its opposition to this argument by failing to respond to it.").  The Court will dismiss Count Three as to Defendants LSF8 and Caliber with prejudice.

### d.  Fraud Claim (Count VI)

In Count Six Plaintiff alleges that Household had actual knowledge of the fraud committed by John and Cullen, and that Household concealed material facts from Plaintiff so that Household could proceed with foreclosure.  (Compl. ¶¶ 266, 268.)  Fogarty apparently attempts to rely on the alleged fraud perpetrated by John and Cullen while obtaining a mortgage from Household, which seemingly would make Household a victim of the fraud as much as Fogarty, as evidence of fraud on Household's behalf.

To state a claim for fraud under New Jersey law, Plaintiff must allege "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."  Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997).

Plaintiff's entire fraud claim appears to be predicated on her contention that when Household represented to her that she was liable to pay the mortgage and that it was a valid lien on the property, and that it had investigated the matter fully and found no fraud, Household did so "with reckless disregard to whether those statements were true or false."  (Opp'n to

Household at 20.)  She further asserts that Household made these "misrepresentations" in order to induce Plaintiff to rely on them, in order that she would not file any legal action against Household, that she did in fact rely on these misrepresentations, and that she was damaged as a result.  (Id.; see Compl. ¶ 265-78.)[8]  However, the Amended Complaint contains no facts supporting at least two of the requisite elements of fraud in Plaintiff's claim against Household.

With respect to the second element, it does not appear from the Amended Complaint that Plaintiff alleges any facts suggesting Household actually knew it was making misrepresentations to Fogarty.[9]  In multiple places she makes conclusory allegations that Household failed to take reasonable steps at the mortgage closings to ensure that the person purporting to be Fogarty was

---

[8] Plaintiff's Amended Complaint actually alleges that Household had "actual knowledge" that the 2003 Mortgage was obtained by fraud, (Compl. ¶ 266), that it "concealed material facts" known to them related to the mortgages and the identity theft, (id. ¶ 268), that it "purposely misled" her to believe that she was liable for the 2003 Mortgage, (id. ¶ 269), that it continues to "perpetrate the fraud" by sending communications regarding the 2003 Mortgage, arranging past due payments, and paying delinquent tax payments, (id. ¶ 275), and that it does so "with malice, fraud and/or oppression."  (Id. ¶ 276).

[9] The Court chooses to set aside the first element, as Plaintiff has apparently pled in a conclusory fashion that the representations made by Household concerning the existence of the 2003 Mortgage and her liability for making payments under the mortgage was false.  This is of course predicated on the assumption that the 2003 Mortgage was invalid, and that Household was obligated to consider it as such as a result of the fraud perpetrated by John and Cullen.  The Court notes that Fogarty cites no support for her position that Household is guilty of fraud merely for not agreeing the mortgage was fraudulent based on its own investigation.  However, because the facts pled by Plaintiff on this issue are unclear at best, the Court will move on to the second and fourth elements of Plaintiff's fraud claim without expressing any opinion as to whether the first element was in fact sufficiently pled.

The Court further notes that Plaintiff apparently also argues Household engaged in misrepresentation by failing to disclose information where it was under a duty to do so.  (Opp'n to Household at 21.)  However, Plaintiff has not indicated what obligated Household to disclose information to Plaintiff about "the [2003] Mortgage, the deferred payments put on the back end of the Mortgage, and about the additional disbursement for taxes and insurance."  (See id.; see also Compl. ¶ 146 (alleging Household failed to provide Fogarty with "all the information she [] requested in order to properly investigate and determine the extent of the fraud perpetrated).)  Moreover, the Amended Complaint does not bolster Plaintiff's position.  Fogarty acknowledges that Household had been sending all of the correspondences with respect to the 2003 Mortgage to John's Florida address, at John's request, and that Household believed it was required to abide by John's request because he was a party on the account.  (id. ¶ 148.)  There is no indication that Household was under an obligation to send the Mortgage materials to Fogarty in New Jersey in light of John's request, or that Household improperly abided by John's request.  Plaintiff's only argument is the conclusory allegation that Household had been mailing the all correspondence to Florida in order to conceal the 2003 Mortgage from Fogarty.  (Id. ¶¶ 151-52.)  This is insufficient to support Plaintiff's claim that Household was failing to fulfill an obligation.  Likewise, Plaintiff has made numerous allegations concerning what documentation Household apparently failed to provide in order to facilitate her investigation of the fraud, (see id. ¶¶ 136-46), but she has not alleged that Household was required to provide her with that information upon her request.  There is simply no support in the Amended Complaint for this version of Plaintiff's "misrepresentation" element.

in fact her,  (see Compl. ¶¶ 94-95, 98), and that Household <u>knew</u> the person representing herself as Fogarty was not actually Fogarty, (<u>id.</u> ¶ 96, 100, 151-52), but Plaintiff offers no facts indicating what steps Household failed to take or why Household should have known about the fraud.  She does allege that Household notified her on two occasions that it had found no fraud with respect to the 2003 Mortgage, (<u>see</u> <u>id.</u> ¶¶ 118, 120), but again, she only offers conclusory allegations to suggest that Household could not reasonably have investigated the matter and concluded that the 2003 Mortgage was not obtained fraudulently.  (<u>See</u> <u>id.</u> ¶¶ 99, 107.)

Even if the Court were to accept Fogarty's conclusory statement that Household knew or should have known that John and Cullen committed fraud during the creation of the 2003 Mortgage, the allegations presented by Plaintiff lead to a different result.  She admits that Household provided a copy of the Customer Identification Verification ("CIV") for the 2003 Mortgage transaction.  (<u>Id.</u> ¶ 153.)  The CIV showed that, at the 2003 Mortgage closing, the individual claiming to be Fogarty verified Cecilia J. Fogarty's identity via a state-issued New Jersey driver's license, with a license number matching Fogarty's and an expiration date of August 31, 2007, (<u>id.</u>),[10] a New Jersey Vehicle Registration Card, (<u>id.</u> ¶161), and a Visa credit card bearing Fogarty's name, (<u>id.</u> ¶ 163), which was later determined to have been acquired by fraud.  (<u>Id.</u> ¶¶ 166-67; <u>see also</u> Ex. I to Compl., Customer Identification Verification ("CIV").)  Fogarty's claim that the CIV contained no indication that "the driver's license referenced on it was a photo driver's license" is clearly a red herring.  (<u>See</u> Compl. ¶ 154.)  The CIV recorded her primary identification as a state-issued New Jersey driver's license, and apparently the license

---

[10] The Court cannot make sense of Fogarty's argument that, if she were to have presented her own driver's license for verification at the 2003 Mortgage transaction, she would have presented "the new photo driver's license that she obtained and was issued on August 1, 2007, not the one that expired on August 31, 2007."  (Compl. ¶ 157.) Seemingly, however, basic principles of time and space would prevent her from proffering an I.D. in September 2003 that she acknowledges she did not obtain until August 2007.

number matched Fogarty's.  There is no obvious space on the CIV form to indicate whether a

state-issued driver's license, which characteristically contains a photo of the individual, is a

photo I.D., and there are no allegations that New Jersey permitted non-photo driver's licenses at

the time.  Thus, even if Household should have known of the fraud based on a discrepancy

between Fogarty's actual identification provided in 2008 and the identification recorded as part

of the 2003 Mortgage closing, there are no facts presented which indicate the materials provided

were false or the person providing them was not actually Fogarty.  In fact, Fogarty has not even

pled that Cullen looked noticeably different in 2003 than Fogarty's own driver's license

photograph.[11]

Perhaps more fatal to Plaintiff's claim is the fact that she cannot plausibly claim that she

reasonably relied to her detriment on Household's representations, and fails to sufficiently allege

the fourth element of a fraud claim.  Her primary argument is that by relying on Household's

representations, she was induced to believe that the 2003 Mortgage existed, to believe that she

---

[11] Fogarty also pleads facts which suggest Household reached a reasonable conclusion in its October 10 Letter, sent the same day it received her October 2011 correspondence regarding the fraud.  Plaintiff avers that the same-day response is evidence of Household's inadequate investigation, and thus proof that Household knew it was not investigating the fraud.  However, the October 10 Letter from Household, which was not in response to an actual fraud claim, suggests that based on the dearth of evidence, Household had nothing more to investigate.  The October 10 Letter informed Fogarty that, because the Household branches in New Jersey had closed, they were unable to investigate any conversations which may have transpired in 2008 when Fogarty first learned of the fraud and visited the Lakewood branch.  (See October 10 Letter; Compl. ¶ 102; see also id. ¶¶ 44-51.)  Consistent with her allegations, the letter also stated Household had no record of a fraud claim having been filed.  (See id. (alleging that she spoke with several Household employees on the phone and visited the Lakewood branch, but not alleging that she ever filed a fraud claim); October 10 Letter ("Our records do not reflect that a fraud claim was submitted.")  In other words, it is not clear Household had more to investigate in the context of Fogarty's letter request.  When Fogarty did file an actual fraud claim in November 2011, (see Compl. ¶ 110), Household apparently investigated her claim and issued its first notice of denial a month later.  (See id. ¶ 118.)  Yet, in that instance, Plaintiff does not allege that Household's investigation was inadequate or that it improperly weighed the evidence before it.  Rather, as indicated above, several of the materials in Household's possession apparently indicate that the person posing as Fogarty provided accurate identifying documentation.

The Court finds that Plaintiff's own allegations do not support her claim that Household knew it was misrepresenting the thoroughness of its investigations.  Not only is the Amended Complaint devoid of any facts pertaining to claims made by Household regarding the thoroughness of its investigations, Plaintiff's own facts suggest that they may have reached a reasonable conclusion in light of the circumstances.

had no other remedy under the circumstances, and to sit on her legal rights.  (See id. ¶¶ 272, 277.)  However, her Amended Complaint is replete with examples of her protestations of the existence of the 2003 Mortgage, and her unwillingness to accept Household's determination that the 2003 Mortgage was not obtained fraudulently.  Nor does Plaintiff allege any facts indicating she actually relied on Household's representations.  The only instance of her supposed reliance described in the Amended Complaint comes after Plaintiff's first attempts to confirm the existence of the mortgage in 2008 and alert Household to the probable fraud.  However, she only states that she contacted Household's Hardship Department and "believed [Household] would continue an investigation of the fraud."  (Id. ¶ 51.)  Plaintiff had not filed a fraud claim, there is no indication that Household represented to Plaintiff that it was going to continue investigating the alleged fraud, and the preceding paragraphs indicate that she was only directed to the Hardship Department in response to the fear she expressed over losing her home.  (See ¶¶ 49-50.)  Fogarty then apparently waited almost three years to inquire further about the 2003 Mortgage.  Before sending Household her correspondence in October 2011, Fogarty actually signed an agreement in June 2011 with John in which he agreed to make the monthly payments on the 2003 Mortgage, suggesting she at least assumed at that time that the 2003 Mortgage existed.  (Id. ¶¶ 182-83.)  In other words, to the extent Plaintiff claims she relied on Households alleged misrepresentations, such reliance was evidently unreasonable.  Due to Fogarty's unswerving belief that the 2003 Mortgage was obtained fraudulently and was not a valid lien on her property, the facts presented are hardly revealing of Fogarty's reliance on Household's representations to her own detriment.[12]

---

[12] The only fact which suggests Household attempted to induce Fogarty to rely on its representations and ignore her legal rights is her allegation that on October 21, 2011, a Household representative named Garo "advised Fogarty to resolve the issue without an attorney and directed Fogarty to the Customer Resolution Department."  (Compl. ¶ 108.)  However, Fogarty concedes that this did not stop her from consistently attempting to have the 2003 Mortgage

With nothing more than conclusory allegations, Fogarty has not sufficiently pled that Household knowingly misrepresented any material facts, with awareness of their falsity, or that she detrimentally relied on Household's alleged misrepresentations.  Thus, Plaintiff's claim for fraud fails as a matter of law.  Count Six will be dismissed from the Amended Complaint as to Defendant Household.

### e.  Slander of Title Claim (Count VII)

In Count Seven Plaintiff alleges that Household slandered her title to the Property when Household recorded the 2003 Mortgage naming her as a mortgagor, and when Household "recorded Lis Pendens on the Property naming [Plaintiff] as a Defendant in a Foreclosure Action that identified [Plaintiff] as a 'borrower' or 'mortgagor' or as otherwise liable for the payment of the mortgages." (Compl. ¶ 282.)  She claims "these recordings, entered into with malicious intent, falsely cast doubt on the validity of [Plaintiff's] title to the property." (Id. ¶ 283.) Household set forth several arguments as to why Plaintiff's claim fails as a matter of law in its initial brief.  (See Def. Household's Br. ("Household Br.") at 14-17.)  In Plaintiff's Opposition to Household, she failed to address Household's arguments entirely.  (See generally Opp'n to Household.)  Accordingly, the Court finds that Plaintiff has waived this claim against Household. See Ferrante, 2014 WL 1092555, at *7.  The Court will dismiss Count VII with prejudice.

### f.  FDCPA, FCRA, and NJCFA Claim (Count IX)

Count Nine is not a model of clarity.  It purports to state a claim for a violation of "NJFCRA" and the FDCPA against Household and Caliber.  The Court notes that there is no

---

removed as a lien on the Property from 2011 until the filing of the present action, as she claims she pursued multiple avenues.  (See id. ¶ 101 (stating Fogarty contacted the New Jersey Department of Banking and Insurance, the Consumer Financial Protection Bureau, the Westampton Police Department and Household "throughout 2011 through 2014" to have the 2003 Mortgage removed based on the theft of her identity and the fraud in obtaining the mortgage).)  Therefore, this fact does not support the element of detrimental reliance.

"NJFCRA" statute, so such a claim fails as a matter of law.  Plaintiff also fails to address Household's and Caliber's substantive arguments in favor of dismissal with respect any putative FDCPA and New Jersey Consumer Fraud Act ("NJCFA") claims.  (See Opp'n to Household at 24-32; Opp'n to LSF8 and Caliber at 7.)[13]  The Court Finds that, to the extent Plaintiff attempts to state claims pursuant to the FDCPA and NJCFA, Plaintiff has waived these claims against Household and Caliber.  See Ferrante, 2014 WL 1092555, at *7.

However, Plaintiff apparently relies entirely on § 1681s-2(b) of the FCRA,[14] despite no such claim appearing in Count Nine of the Amended Complaint.  (Compare Opp'n to Household at 24-32 (referring repeatedly to provisions of the FCRA); with Compl. ¶¶ 301-05 (exclusively citing provisions of the FDCPA).)  Though the Court need not reach the issue, as Plaintiff is not permitted to amend her pleadings by way of her response to Defendants' Motions to Dismiss, it still finds Plaintiff has failed to state a claim, even if she had asserted a claim pursuant to the FCRA.

Section 1681s-2(b) is the only section in the FCRA that can be enforced by a private citizen who seeks to recover damages caused by a furnisher of information.  SimmsParris v. Countrywide Fin. Corp., 652 F.3d 355, 358 (3d Cir. 2011).  However, the duties placed on furnishers pursuant to § 1681s-2(b) are implicated only "[a]fter receiving notice pursuant to section 1681i(a)(2) of this title with regard to the completeness or accuracy of any information

---

[13] Concerning an FDCPA claim, Household argued that it was not a "debt collector" under the FDCPA with respect to the 2003 Mortgage, and was not subject to the FDCPA provisions cited by Plaintiff in her Amended Complaint. (See Household Br. at 18-19 (citing 15 U.S.C. § 1692a(6)(F)).)  Caliber argued that Plaintiff failed to allege any prohibited conduct on its part in violation of the FDCPA.  (See LSF8 and Caliber Br. at 12-13.)  With respect to a possible NJCFA claim, Caliber argued that Plaintiff failed to satisfy the heightened pleading requirements for claims brought under the NJCFA, including a showing of intent on behalf of Defendants.  (See id. at 14-15.)

[14] Plaintiff also refers to 12 C.F.R. § 1022.43.  (See Opp'n to Household at 30-31.)  While this regulation requires that furnishers conduct reasonable investigations of direct disputes from consumers, there is no private right of action established in the law for a furnisher's failure to comply with this regulation.  See § 1022.43; see also 15 U.S.C. § 1681s-2(c)-(d) (permitting private enforcement of only § 1681s-2(b) pursuant to § 1681n & § 1681o).

provided by a person to a consumer reporting agency." § 1681s-2(b)(1); see also SimmsParris, 652 F.3d at 358.  That means a consumer may not bring a cause of action pursuant to § 1681s-2(b) until notice under § 1681i(a)(2) has been given by a credit reporting agency ("CRA"), while direct notice from the consumer is insufficient.  SimmsParris, 652 F.3d at 358.  Once a dispute is made to a CRA, the credit furnisher must investigate the dispute and verify the reporting information.  § 1681s-2(b)(1).

Plaintiff claims in her Opposition that she "notified the consumer reporting agencies that she disputed the mortgage showing on her credit report, notified them of the fraud related to the Mortgage transaction and that she was the victim of identity theft as required under the [FCRA], 15 U.S.C. § 1681i(a)(1)." (Opp'n to Household at 24 (citing Compl. at 22-23.).)  However, the Amended Complaint only states that Plaintiff notified "the credit reporting agencies of the fraud perpetrated upon her and that she was the victim of identity theft … [a]t various times." (Compl. ¶ 168 (emphasis added).)  It also avers that Plaintiff is in the process of "obtaining proofs of the reporting of the identity theft and Fraud Alerts she facilitated being placed on her credit reports at the time of the filing of this action," (id.), and that on January 15, 2014 "a Fraud Alert was placed on her account through Transunion."  (Id. ¶ 169.)[15]

It is not clear, based on the numerous frauds John apparently committed, that Plaintiff's notifications to the CRAs concerned a dispute of the 2003 Mortgage.  Plaintiff has not explicitly said anywhere in her Amended Complaint that she filed a dispute with the CRAs regarding this mortgage, indicated that any CRAs undertook to investigate the completeness or accuracy of the 2003 Mortgage, or indicated that any CRAs made a positive or negative determination with

---

[15] Though Plaintiff argues in her Opposition that she filed a dispute with the CRAs and Household received notice of the dispute from those CRAs, those allegations do not appear in the Amended Complaint, and are thus not part of the pleadings.

respect to her dispute.  See § 1681i(a)(1)(A) ("[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly … of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate").  Nor has Plaintiff indicated what information she provided to any CRAs with respect to any alleged dispute.  See § 1681i(a)(2)(A) (stating that when a CRA gives notice of a consumer dispute to a furnisher of information, the notice "shall include all relevant information regarding the dispute that the agency has received from the consumer").  Plaintiff has not even indicated whether she is claiming Household or Caliber (a) failed to adequately investigate any dispute reported by the CRAs or (b) failed to report their findings to the CRAs within the statutory timeframe.

The time-line is equally nebulous, as the Amended Complaint says Fogarty communicated with the CRAs "[a]t various times."  (Compl. ¶ 168.)  Plaintiff's awareness of the alleged fraudulent activity spans over six years in the Amended Complaint, and Plaintiff gives no indication of when any particular dispute was filed with the CRAs regarding the 2003 Mortgage. Without more, the Court is unable to infer that Plaintiff filed a dispute with the CRAs regarding the mortgage, the CRAs reported the dispute to Household or Caliber, and Household or Caliber failed to comply with their statutory obligations within the required timeframe.  While Plaintiff may still be awaiting "proofs" of any report she submitted to dispute the 2003 Mortgage with the CRAs, (see id.), she is not powerless to plead that she informed the CRAs of her dispute at a certain date, that the CRAs undertook to investigate her dispute, and that Household or Caliber failed in some capacity to fulfill their statutory obligations.  Conclusory allegations coupled with a promise that evidence will come later is insufficient to sustain a claim on a Motion to Dismiss.

Not only has Plaintiff failed support of the allegations she <u>actually</u> asserts in Count Nine, she fails to point to facts in the Amended Complaint which would support an amended claim for a violation of the FCRA.  Accordingly, the Court will dismiss Count IX as to Defendants Household and Caliber.

### g.   Quiet Title Claim (Count X)

In Count Ten Plaintiff claims she is entitled to quiet title on the Property based in part on her allegation that "no money is owed to LSF8 by Fogarty" because LSF8 allegedly does not hold the promissory note for the 2003 Mortgage.  (Compl. ¶ 309.)  LSF8 argues that Plaintiff's quitclaim deed from John does not invalidate LSF8's lien on the Property under New Jersey Law, and no "special circumstances" exist which entitle Plaintiff to cancel the 2003 Mortgage. The Court agrees.

Under New Jersey law, quiet title actions are brought when ownership or title to property is disputed or contested.  N.J. Stat. § 2A:62-1.  This includes situations where a property owner seeks to resolve whether a putative assignee of an otherwise valid mortgage properly holds the mortgage.  <u>See</u> <u>Suser v. Wachovia Mortg., FSB</u>, 433 N.J. Super. 317, 324-25 (App. Div. 2013).

Here, Plaintiff's sole contention against LSF8 is that, because LSF8 allegedly does not hold the promissory note for the 2003 Mortgage, Plaintiff is not liable to LSF8 on any obligation arising under the 2003 Mortgage.  However, Plaintiff's only support for her position is her claim that there is no indication from the Assignment of Mortgage, attached as Exhibit B to Joy Sperling's Declaration, that it was executed with a valid power of attorney, (<u>see</u> Opp'n to Household at 4-5), and the date listed on the Allonge to the Promissory Note was September 22, 2003.  (Opp'n to LSF8 and Caliber at 2; <u>see also</u> Ex. C. to Sperling Cert., Promissory Note and Allonge ("Note and Allonge").)

25

Setting aside the issue of whether Plaintiff even has standing to challenge the validity of an assignment between two separate entities, the record and the law do not support Plaintiff's position.  First, the date on the Allonge to the Promissory Note does say September 22, 2003.  (Id.)  Yet, this says nothing of when the transfer of the Note was effective.  This fact is made clearer by the copy of the Assignment of Mortgage, which appears to have occurred on August 8, 2014, and was recorded with the Clerk of Burlington County on August 20, 2014.  (Assignment of Mortgage.)[16]  The 2003 Mortgage documents indicate that Household was the holder of the mortgage as of September 22, 2003, and the Promissory Note indicates the same.  (See Ex. A to Sperling Cert., 2003 Mortgage Documents; Note and Allonge.)  Moreover, despite Plaintiff's argument, Household did transfer the power of attorney to Caliber as part of the Assignment.  (See Ex. A to Sperling Supp. Cert., Limited Power of Attorney to Successor Servicer, Dated April 29, 2014.)  Thus, to the extent Plaintiff bases her claim on any doubt over whether and when LSF8 was assigned the 2003 Mortgage, the Court finds that the uncontroverted documents in the record show the Mortgage was in fact transferred and assigned to LSF8 in August 2014, and Plaintiff has failed to state a claim on which relief may be granted.

Accordingly, Count Ten is dismissed with prejudice as to Defendant LSF8.

**h.  Specific Performance Claim (Count XII)**

In Count Twelve Plaintiff seeks cancellation of the 2003 Mortgage.  Under New Jersey law, a party seeking cancellation of a mortgage must:

> a.  Present satisfactory proof that the principal and interest due on the mortgage have been fully paid; or

---

[16] For this reason, to the extent Plaintiff is attempting to amend her Amended Complaint to challenge the validity of the assignment between Household and LSF8 based on the supposed ambiguity as to whether LSF8 might have been the owner of the loan from its inception, the Court will deny Plaintiff's request.

      b.  Deposit with the clerk of the Superior Court in the county in which the mortgage is of record any balance of principal and interest due on the mortgage according to the terms thereof; or

      c.  Present such special circumstances as to satisfy the court that the mortgagee and his successors, if any, in right, title and interest have no further interest in the mortgage or the debt secured thereby.

N.J. Stat. § 2A:51-1.  Plaintiff concedes paragraphs (a) and (b) in § 2A:51-1 are not applicable in this matter.  (Opp'n to LSF8 and Caliber at 9-10.)  That leaves only paragraph (c), and Plaintiff argues the "special circumstances" under which she seeks an Order cancelling the 2003 Mortgage are "specifically set forth in the [Amended Complaint]."  (Id. at 10.)

     Nowhere in the Amended Complaint does it appear to the Court that there are "special circumstances" suggesting that LSF8 or Caliber have "no further interest in the mortgage or the debt secured thereby."  As noted above, LSF8 is the assignee of the Mortgage, and current holder of the Promissory Note.  It appears clear from the record that LSF8 has a further interest in the mortgage.  (See Compl. ¶ 172 (noting that, as of June 6, 2014, Caliber informed John and Fogarty that there was a past due amount of $13,006.64 for the 2003 Mortgage).)  Plaintiff has not alleged, or cited to, any "special circumstances" which would be relevant under § 2A:51-1(c).  See Kielty v. Arena, 2006 WL 695469, at *2 (N.J. Super. Ct. Ch. Div. Mar. 17, 2006) (finding special circumstances likely existed where mortgagor was unable to locate the mortgagee or any heirs of the mortgagee, no payments had been made on the mortgage for over eight years, the mortgagee had not instituted foreclosure proceedings, and the mortgagee did not respond to service by publication).

     Accordingly, the Court will dismiss Count Twelve against Defendant Caliber with prejudice.

      **i.  Identity Theft Claim (Count XIV)**

In Count Fourteen Plaintiff purports to plead a cause of action for "identity theft" against Household.  Despite being somewhat ambiguous, it appears Plaintiff seeks recovery pursuant to New Jersey Statutes § 2C:21-17.4(a).  (See Compl. ¶ 337; see also Opp'n to Household at 33-35.)[17]

Section 2C:21-17.4(a) permits a person who has suffered "any ascertainable loss of moneys or property, real or personal, as a result of the use of that person's personal identifying information," to bring a cause of action against the thief.  See Piscitelli, 408 N.J. Super. at 115 ("[Section] 2C:21–17.4 provides a civil remedy for identity theft for the victim.  It provides for treble damages, costs, and attorneys' fees.  Its relief, though, is directed against the thief.") Section 2C:21-17 states that a person is guilty of identity theft if he or she, in relevant part:

> Obtains any personal identifying information pertaining to another person and uses that information, or assists another person in using the information, in order to assume the identity of or represent himself as another person, without that person's authorization and with the purpose to fraudulently obtain or attempt to obtain a benefit or services, or avoid the payment of debt or other legal obligation or avoid prosecution for a crime by using the name of the other person.

(emphasis added).  In other words, the law criminalizes obtaining the personal identifying information of another person and using that information, or assisting another person in using that information, to pretend to be the victim.

---

[17] To the extent Plaintiff seeks to assert a common law claim for "identity theft" against Household, the Court is aware of no such claim under New Jersey Law.  (See Opp'n to Household at 33-34.)  Even the language from Piscitelli v. Classic Residence by Hyatt, 408 N.J. Super. 83 (App. Div. 2009), quoted by Plaintiff, indicates that New Jersey Courts have yet to recognize a common law cause of action for identity theft under these circumstances.  See id. at 115-16 ("We recognize that our Supreme Court, recently in Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 403–04 n.13 (2009), acknowledged that while it did not find a cause of action for negligent investigation of identity theft that 'nothing in [its] opinion should be read to foreclose forever a claim that, in appropriate circumstances, a bank may have a duty of care to an innocent, unrelated third party harmed by the theft of his or her identity,' but we do not find there to be appropriate circumstances in this case to impose on all employers a duty of care to verify that all prospective employees are who they say they are, so as to protect unrelated third-parties.")

Plaintiff has only pled that Household negligently or mistakenly relied on John and Cullen's representations that Cullen was in fact Fogarty, and was implicated in John and Cullen's theft of Fogarty's identity by failing to collect proper identification that would have shown Cullen was not Fogarty.  (Compl. ¶¶ 328-29, 333.)  However, Plaintiff has not pled that Household purposefully assisted John or Cullen in obtaining Fogarty's information, or that Household intended to use that information with a fraudulent purpose.

The Court finds that Plaintiff fails to plead a claim for identity theft under New Jersey law against Household.  Accordingly, Count Fourteen of the Amended Complaint will be dismissed as to Defendant Household.

**j.  Unauthorized Payment of Property Taxes Claim (Count XV)**

In Count Fifteen Plaintiff claims that Household and Caliber are liable for advancing funds for real estate taxes on the Property.  The gist of Plaintiff's claim is that Household, and then Caliber, paid real estate taxes on the Property at the same time Plaintiff was sending payments for those taxes, and because Household's and Caliber's funds went through first, the amount they paid on John and Fogarty's behalf was added to the overall total due on the 2003 Mortgage, thereby raising Plaintiff's monthly rates.

As an initial matter, the Court is unaware of any action for "unauthorized payment of property taxes."  Plaintiff's argument appears to be, though it is found nowhere in the Amended Complaint, that the payment of taxes by Household and Caliber involved the disbursement of money which resulted in the rescheduling of payments under the 2003 Mortgage, which in turn subjected Household and Caliber to the TILA disclosure requirements.  (See Opp'n to Household

at 36-37.)  This argument is the same as the one put forth by Plaintiff in support of Count One, which the Court has already rejected.[18]

Even if Plaintiff's claim were based on breach of contract, Plaintiff's Amended Complaint makes clear that "the 2003 Mortgage [] contain[ed] a term that permit[ed] [Household] to pay taxes for the Property."  (Compl. ¶ 345.)  Plaintiff admits that the taxes had not been paid by her or John, and liens were placed on the property because of the tax delinquency.  (Id. ¶¶ 348, 351.)  She acknowledges that Household paid for "back taxes" and dispersed funds to "pay off tax liens placed on the property."  (Id. ¶¶ 347-48.)  Plaintiff even admits that, pursuant to an agreement she signed with him, John was responsible for making the real estate tax payments and failed to do so.  (Id. at 351.)  In essence, Plaintiff has pled facts entirely favorable to Defendants, to the extent that she seeks to assert a claim for breach of contract.

Based on the foregoing, the Court finds that Plaintiff's claim for "unauthorized payment of property taxes" fails as a matter of law.  The Court will dismiss Count Fifteen with prejudice as to Household and Caliber.

### k.  Intentional Infliction of Emotional Distress Claim (Count XVI)

In Count Sixteen Plaintiff asserts a claim for intentional (or reckless) infliction of emotional distress against Household.  By its actions, Household allegedly put Fogarty "in constant fear that she would lose her home," (Compl. ¶ 362), embarrassed her and caused her stress due to the Lis Pendens placed on her Property, (id. ¶ 363), and placed her in fear that a publication regarding a pending foreclosure or tax sale would be published in the local community paper, thereby ruining her reputation.  (Id. ¶ 364.)  Household argues that the

---

[18] See supra at note 6.

conduct complained of fails to establish the elements necessary to state a claim for intentional infliction of emotional distress ("IIED").  Because Plaintiff has failed to plead "extreme and outrageous conduct," the Court finds that she has failed to state a claim.

To state a claim for IIED under New Jersey law, a plaintiff must allege that the defendant (1) acted intentionally or recklessly and (2) outrageously, and (3) proximately caused (4) severe distress.  Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 366 (1988).  Regarding the first element, the defendant "must intend both to do the act and to produce emotional distress."  Id.  Next, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Id. (quoting Restatement (Second) of Torts § 46 cmt. d).[19]  Once the Court has determined that the defendant's actions proximately caused the plaintiff's emotional distress, plaintiff must show the distress suffered is "so severe that no reasonable man could be expected to endure it."  Buckley, 111 N.J. at 366-67 (quoting Restatement (Second) of Torts § 46 cmt. j).

It is worth noting that the "elevated threshold" for finding outrageous conduct is only satisfied in extreme cases under New Jersey law.  Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 23 (App. Div. 2001).  Conduct that has been found to meet this "elevated threshold" includes: a county sheriff's using an atrocious racial slur to refer to an African–American

---

[19] See also 49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc., 227 N.J. Super. 449, 471-72 (App. Div. 1988) (quoting Restatement (Second) of Torts § 46 cmt. d) ("The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous.  It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' … The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.")

employee, Taylor v. Metzger, 152 N.J. 490, 508–21 (1998); a defendant teacher's false report that the plaintiff teacher, a practicing non-violent Buddhist, had threatened to kill her students, and arranging to have the plaintiff removed publicly from the school, allegedly in retaliation for rebuking the defendant's sexual advances, Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 568, 587–88 (2009); a supervisor and two co-workers at a military facility surrounding the plaintiff and making comments and gestures to suggest that she was to perform a sexual act on the supervisor while the others watched, followed by a threatening telephone call implying that the Mafia would become involved if the plaintiff pursued the investigation, Wigginton v. Servidio, 324 N.J. Super. 114, 119–20, 123, 130–32 (App. Div. 1999), certif. denied, 163 N.J. 11 (2000); a landlord's intentional shutting off heat, running water, and security in a rent-controlled building in an effort to induce the tenants to vacate, 49 Prospect St., 227 N.J. Super. at 455–57, 466, 471–75; and a doctor's allegedly telling parents that their child was "suffering from a rare disease which may be cancerous knowing that the child has nothing more than a mildly infected appendix." Hume v. Bayer, 178 N.J. Super. 310, 319 (Law Div. 1981).

Otherwise, federal and state courts have declined to find extreme and outrageous conduct where: the plaintiff, a detective, was subjected to unusual discipline, including that he present himself for a psychiatric evaluation, Zamboni v. Stamler, 847 F.2d 73, 76, 80 (3d Cir. 1988), cert. denied, 488 U.S. 899 (1988); the plaintiff's co-workers treated her rudely and unprofessionally, called her names, and gestured in a physically intimidating manner, Ferraro v. Bell Atlantic Co., 2 F. Supp. 2d 577, 589 (D.N.J. 1998); derogatory gender-based comments were made to the plaintiff along with allegations that her fiancé was a "cheat" and a "liar," Obendorfer v. Gitano Group, Inc., 838 F. Supp. 950, 952, 955 (D.N.J. 1993); a supervisor expressed doubt that the plaintiff had been diagnosed with breast cancer, and then came near her

"on the verge of physically bumping into [the plaintiff's] breast area as if to see" if she truly had a mastectomy, Harris v. Middlesex County College, 353 N.J. Super. 31, 36, 46–47 (App. Div. 2002); and managers at an appliance retailer brought theft charges against the plaintiff sales manager for selling a television to his brother-in-law below cost. Griffin, 337 N.J. Super. at 20–25.

Plaintiff alleges that Household's actions were made with "a deliberate disregard or a reckless indifference of a high degree of probability that they would cause emotional distress to Fogarty." (Compl. ¶ 359.) She has also alleged that as a direct and proximate result of Household's actions, she suffered "extreme and severe emotional distress, frustration, humiliation, indignation, wounded pride, despair, anxiety, stress, depression and fright." (Id. ¶ 361.) The Court finds that Fogarty has pled the first and third elements of her IIED claim.

Despite Fogarty's claimed abundance of suffering, the Court does not find that Household's conduct was "extreme" or "outrageous." The totality of Household's alleged outrageous conduct consists of (a) filing a Lis Pendens on the Property, (b) failing to timely and courteously respond to Fogarty's requests for information that would assist her in verifying the fraud perpetrated by John and Cullen, (c) summarily dismissing Fogarty's fraud claim without an adequate investigation, (d) continuing to insist that John and Fogarty were obligated to pay the 2003 Mortgage, and (e) issuing written threats of foreclosure. (See Opp'n to Household at 39-41.) Viewed individually or collectively, these acts are insufficient to sustain her claim against Household.

First, each Lis Pendens filed on the Property was with respect to a foreclosure action commenced before Fogarty had allegedly even learned of the 2003 Mortgage. (See Compl. ¶¶ 25(I)-(J); Ex. B to Household Br., February 21, 2007, Lis Pendens.) It is unclear how this

conduct could have been taken with the intent of causing Fogarty emotional distress, particularly when her allegations of fraud had not yet been made known to Household. Moreover, Fogarty does not claim that the foreclosure actions were instigated for any unlawful or improper reasons. Similarly the written "threats" of foreclosure do not suggest any outrageous conduct on behalf of Household, in light of the circumstances presented in the pleadings and the exhibits attached thereto. The October 10 Letter informed Fogarty and John that, because the account was past due in the amount of $23,286.02, the account had been placed with the Loss Mitigation Department, but "a foreclosure sale date has not been scheduled." (October 10 Letter.) While not even a "threat" of foreclosure, this letter clearly indicates that Household's actions were guided by the large past due amount on the 2003 Mortgage. The notice of default sent to Fogarty in 2013, (see Compl. ¶ 127), was just that – a notice of default on the mortgage payments. Then, the Notice of Intention to Foreclose, sent to John and Fogarty in early 2014, mentioned that Household had not received payments for several months and the account was in default. (Ex. L to Compl., Notice of Intention to Foreclose.)

The record suggests that Household was not receiving the scheduled payments, and was informing Fogarty and John that the 2003 Mortgage was in default. The delinquency of payments on the 2003 Mortgage are confirmed in the Amended Complaint, where Fogarty acknowledges that John failed to perform his obligations under an agreement he had signed with Fogarty, including the promise to pay 2003 Mortgage payments while Fogarty sought release from the mortgage. (See Compl. ¶¶ 182-83, 193.) In light of the admittedly past due amounts, and Household's finding that the 2003 Mortgage was not obtained fraudulently, it was not outrageous for Household to expect John and Fogarty to meet their obligation to pay according to the terms of the mortgage. Viewed in the alternative, it would seem highly unusual for

34

Household to cease attempting to collect the money due to it under the 2003 Mortgage based solely on the claim by a mortgagor that the mortgage is invalid.

What remains, and is in fact the crux of Plaintiff's claim, is Household's decision denying Plaintiff's request to have the mortgage rescinded due to fraud.  Though it is clear Plaintiff was dissatisfied with the outcome of her requests to have Household examine and rescind the 2003 Mortgage based on Fogarty's allegations of fraud, it is not clear its conduct amounted to anything approaching "outrageous."  As discussed above, Household's determination that there was no fraud in the making of the 2003 Mortgage may or may not have been incorrect, but that decision alone does not implicate Household in that fraud.[20]  Telling Plaintiff to speak with various employees, transferring her to different departments, mishandling her paperwork after an office move, giving her an incorrect phone number to call if she had further questions, and rejecting her claim with minimal investigation of the matter cannot be deemed the sort of conduct considered "intolerable in a civilized community."  Restatement (Second) of Torts § 46 cmt. d.[21]

It is unclear that Household's actions could even be considered negligent,[22] let alone something beyond criminal.  See id.  The only support Plaintiff marshals for the outrageousness of Household's actions is her conclusion that it should have reached the same conclusion she did with respect to the fraud claim, in light of the available evidence.  But, even assuming arguendo that Household should have determined that the 2003 Mortgage was obtained fraudulently, its failure to do so is not sufficiently outrageous.  The only allegations in the Amended Complaint

---

[20] See supra at Part III.d.

[21] If such were the case, most individuals would have a colorable claim for IIED against their television, internet, and/or cellular telephone service providers.

[22] See infra at Part III.l.

regarding Household's motive for failing to agree with Fogarty's allegations of fraud are couched as legal conclusions.[23]  There are no facts which suggest Household did anything improper with the information it had in reaching its conclusion, or that it had an ulterior motive. Plaintiff has not claimed, and points to no allegations suggesting, that Household's decision was vindictive or intentionally aimed at increasing her suffering.  There are no allegations that Household was aware of some special sensitivity Plaintiff had with regards to the Property and the effects of John's misappropriation of her assets.  See Hume, 178 N.J. Super. at 315 (describing situations of outrageous conduct as existing where actions are "especially calculated to cause … mental distress of a very serious kind."); Buckley, 111 N.J. at 368 (noting that a claim for IIED should fail when a bank wrongfully dishonors a check "unless the bank's conduct is intentional, as well as reckless or outrageous, and the distress is severe or results in bodily injury.") (citing Hume, 178 N.J. super. at 319).  In sum, even if Household's decision was wrong, it was not extreme or outrageous, and Plaintiff's claim fails as a matter of law.

Nor can Plaintiff establish the fourth element, that her alleged emotional distress was sufficiently severe.  The Amended Complaint only alleges that Fogarty was stressed, embarrassed, and in despair as a result of Household's actions.  Yet, Plaintiff's allegations and the record do not present the sort of circumstances of emotional distress "so severe that no reasonable [wo]man could be expected to endure it."  Restatement (Second) of Torts § 46 cmt. j; Buckley, 111 N.J. at 368.  Though restated in several places and in various iterations, Plaintiff's

---

[23] (See Compl. ¶¶ 99-100 (asserting that Household "failed to take reasonable steps to investigate or report the fraud" reported by Fogarty, and claiming that Household fraudulently concealed the mortgages from Fogarty "in order that [it] might profit from the transactions); id. ¶ 107 (suggesting Household did not adequately investigate her fraud claim, because "[a]ny reasonably diligent investigation into the facts presented … would necessarily take more than one day to complete."); id. ¶¶ 151-52 (claiming Household "knew that the 2003 Mortgage was obtained without Fogarty's consent," without alleging Household ever acknowledged the mortgage was obtained fraudulently); id. ¶ 160 (alleging Household "failed to identify or acknowledge that there was a problem with the identification presented … at the mortgage closings," despite acknowledging in paragraph 153 that Household had recorded information from a driver's license matching Fogarty's at those mortgage closings).)

distress amounts to aggravation, frustration, embarrassment, and anxiety, which is insufficient to support her claim.  See id. (holding that where complaints amount to nothing more than "aggravation, embarrassment, an unspecified number of headaches, and loss of sleep," plaintiff's IIED claim failed as a matter of law).  Plaintiff does not describe how her life has been affected by her distress, how her daily routine has changed, how intensity of her distress has impacted her life, or even that she would have no place to live if the Property were foreclosed.  See id. at 368-69 (citing cases).  It is for the Court to decide whether emotional distress can be found as a matter of law, and here Plaintiff has failed to allege facts sufficient to support her claim.  See id. at 367 ("The severity of the emotional distress raises questions of both law and fact. Thus, the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved.")

Because Plaintiff has neither adequately pled outrageous conduct on behalf of Household, nor pled emotional distress that is sufficiently severe, the Court will grant Household's Motion to Dismiss this claim.  Count Sixteen will be dismissed from the Amended Complaint with respect to Defendant Household.

### l.  Per Se Negligence Claim (Count XVII)

In Count Seventeen Plaintiff asserts a per se negligence claim, alleging that Household breached its "duty of care established in … federal laws," with regard to the 2003 Mortgage. (Compl. ¶¶ 370-74.)  Plaintiff apparently attempts to include all of the federal laws mentioned in her Amended Complaint as part of Household's duty.  (See id. ¶¶ 371-72.)

To the extent that Plaintiff's claim is based on an alleged common law duty arising from the other statutes cited in her Amended Complaint, the Court notes that each of those claims already fails as a matter of law for the reasons discussed above.  Thus, Plaintiff's negligence

claim must necessarily fail with respect to those supposed statutory duties.  Moreover, to the extent Plaintiff's claim is based on credit reporting activities, it is preempted by the FCRA, as discussed <u>supra</u> at Part III.b.

It is also Fogarty's belief that Household has never filed a Suspicious Activity Report ("SAR") relevant to the mortgage transactions and as a result of the identity theft and fraud reported by Fogarty.  (<u>Id.</u> ¶ 176.)  She claims Household's failure to file an SAR is a violation of the Bank Secrecy Act ("BSA").  (<u>Id.</u> ¶ 180.)

To sustain an action for negligence under New Jersey law, a plaintiff must allege "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages."  <u>Brunson v. Affinity Fed. Cred. Union</u>, 199 N.J. 381, 400 (2009) (internal quotation marks omitted) (quoting <u>Polzo v. Cnty. of Essex</u>, 196 N.J. 569, 584 (2008)).  Additionally, it is a "well-established principle" in New Jersey tort law that "the violation of a legislated standard of conduct may be regarded as evidence of negligence if the plaintiff was a member of the class for whose benefit the standard was established."  <u>Alloway v. Bradlees, Inc.</u>, 157 N.J. 221, 236 (1999).

Not only has Plaintiff failed to allege any of the required elements of a negligence claim in her Amended Complaint, the mere recitation of the elements in her Opposition, without further factual support, cannot sustain her claim.  Moreover, the Court notes that the purposes of the BSA provisions cited by Plaintiff are to aid in "criminal, tax, or regulatory investigations or proceedings," as well as to help with conducting "intelligence or counterintelligence activities, including analysis, to protect against international terrorism."  12 U.S.C. § 1829b(2); 31 U.S.C. § 5311; <u>see also</u> 12 U.S.C. § 1951.  In other words, Plaintiff has not pled, and cannot plead, that she was "a member of the class for whose benefit the standard [in the BSA] was established."  <u>Alloway</u>, 157 N.J. at 236.

Accordingly, Plaintiff's negligence per se claim fails as a matter of law. Count Seventeen will be dismissed as to Defendant Household.

## IV.   LEAVE TO AMEND

"[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." Phillips, 515 F.3d at 245 (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)). Indeed, even when "a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

Because the Court finds that Plaintiff may be able to cure the pleading deficiencies identified above such that amendment would not be futile, the Court will grant Plaintiff the opportunity to seek leave to amend her Amended Complaint within fourteen days of the date of this Opinion and accompanying Order.[24] However, because the Court will dismiss Counts I-III, VII, X, XII, and XV with prejudice, Plaintiff will not be permitted to amend those claims. Hartman v. Twp. of Readington, No. 02-2017, 2006 WL 3485995, at *3 (D.N.J. Nov. 30, 2006) ("Dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile.")

## V.   CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss will be **GRANTED**. Counts VI, IX, XIV, XVI, and XVII will be **DISMISSED WITHOUT PREJUDICE**. Counts I-III, VII, X, XII, and XV will be **DISMISSED WITH PREJUDICE**. Plaintiff shall have

---

[24] If Plaintiff files a Motion for Leave to Amend the Amended Complaint, she shall attach to the Motion a copy of the proposed Second Amended Complaint, as required by Loc. Civ. R. 7.1(f).

**fourteen (14) days** from the date of this Opinion and accompanying Order to file a motion

seeking leave to amend her Amended Complaint.

Dated: ___2/25/2015___                              __s/ Robert B. Kugler___
                                                     ROBERT B. KUGLER
                                                     United States District Judge

40